### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IMS HEALTH INCORPORATED

        Plaintiff,

     v.

EDWARD BURLEIGH

        Defendant.

Civil Action No. _____

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

### NATURE OF THE ACTION

      IMS Health Incorporated ("IMS Health," "Plaintiff" or "Company"), by and through its undersigned counsel, hereby brings the following Complaint against Defendant Edward Burleigh ("Burleigh" or "Defendant") seeking injunctive relief and damages.

### PRELIMINARY STATEMENT

      1.     IMS Health has initiated this action to prevent Burleigh, an Engagement Manager and longstanding key member of IMS Health's Customer Information Management and Analytics division ("CIMA" or "IM") focusing on hospital procedure/diagnosis data ("HPD"), from causing IMS Health irreparable harm by violating his binding restrictive covenant with IMS Health and performing services for a direct competitor, Truven Health Analytics Inc. ("Truven").

      2.     The need for this relief is critical. Burleigh is intimately familiar with critical details pertaining to IMS Health's most valuable data processes, models, analytics, and relationships, particularly with respect to its processes for (1) procuring various kinds of inpatient and outpatient claims data; (2) projection methodologies for procedure and diagnostic

codes at healthcare facilities; and (3) facility and physician level targeting and segmentation methodologies for the healthcare settings and data described in this paragraph and in greater detail, below, among other commercially sensitive processes and information.

        3.     Indeed, for many years, Burleigh served as a critical provider of analytics solutions for IMS Health clients with respect to, among other things, project solutions utilizing medical diagnostic and procedure codes (*i.e.*, ICD-9 and CPT code groupings), on which solutions IMS Health's clients rely to develop better products and more informed and productive marketing strategies. The methodology and analytics capabilities sold by IMS Health and engineered by Burleigh provide IMS Health's clients with a valuable and proprietary analysis of the diagnostic, surgical, and prescriptive practices of both medical facilities and, critically, individual health practitioners within and across those facilities. In fact, Burleigh was the principal architect of the precise analytics methodology that IMS Health uses to compete against Truven and similar companies with respect to physician-targeting, which he developed while on IMS Health's payroll and for IMS Health's benefit. Burleigh's contribution is further demonstrated through his recent contribution to a key company innovation, being named as an inventor in a patent application to be filed by IMS Health. There is no conceivable way that Burleigh can perform his new job as Director of Product Development for Truven without compromising IMS Health's confidences.

        4.     Burleigh also served as a subject matter expert and key technical liaison with IMS Health's sales team with respect to the solutions IMS Health could engineer to respond to specific customers' commercial needs. For a given client, Burleigh would work with the customer and other IMS Health representatives in identifying the specific data needed, the methodology to pull the key information from the data, and how to implement such a process

efficiently and productively.  Burleigh would then work with IMS Health technical employees on executing the protocol he developed and performing quality control on the product before providing it to the customer.  As a result, Burleigh has detailed knowledge of customer commercial needs in the space in which IMS Health and Truven compete, IMS Health's processes for meeting those needs, and the type of data required to do so.  Perhaps just as importantly, Burleigh – through experience learned at IMS Health – knows what processes do *not* work for meeting certain customer data needs, and would be able to share that insight with Truven and thereby give his new employer an unfair advantage.  Through this experience, Burleigh also knows which IMS Health customers might be unhappy with certain aspects of their engagement with IMS Health, and the weaknesses and potential deficiencies of certain services offered by IMS Health.  There is no conceivable way that Burleigh can faithfully serve as the Director of Product Development without harming IMS Health.

5.     Burleigh has also served as a key thought leader with respect to IMS Health offerings related to a variety of healthcare informatics solutions, including enhancements to the aforementioned physician targeting methodology that IMS Health has recently brought to market, which IMS Health anticipates will help it compete with companies like Burleigh's new employer, Truven.  There is no conceivable way that Burleigh can faithfully serve as the Director of Product Development without harming IMS Health.

6.     Reflective of Burleigh's job responsibilities and exposure to IMS Health trade secrets and confidential information and in consideration for and as a condition to his offer of employment and participation in bonus plans and other benefits, on June 26, 2006, Burleigh entered into a Proprietary Information and Restrictive Covenant Agreement (the "Restrictive Covenant") with his predecessor employer, Surveillance Data Inc. ("SDI"), which IMS Health

acquired in 2011 (and subsequently merged into IMS Health), a true and correct copy of which Restrictive Covenant is attached hereto as Exhibit A.  Therein, Burleigh expressly acknowledge that he would be given access to trade secrets and confidential information and agreed not to disclose that information or, for a one year period following the termination of his employment with SDI (now IMS Health), not to compete with it.  SDI entered and IMS Health has maintained this agreement to avoid precisely the situation Burleigh and Truven have now created:  a direct competitor's hiring of key personnel critical to maintaining IMS Health's ability to compete in a diverse marketplace.  Burleigh now intends to flout his obligations for Truven's benefit.

> 7.     Burleigh fully understood the confidentiality and non-compete obligations to which he agreed when he entered into the Restrictive Covenant, as expressly acknowledged therein at § 5.1, and at all times thereafter.

> 8.     IMS Health's concern and need for injunctive relief is bolstered by both the timing of Truven's recruitment of Burleigh and its reaction to IMS Health's articulated concerns.  Upon information and belief, and as communicated by Burleigh to his management team (Keith Mandia and Charles Wallace), Truven had expressed intermittent interest in employing Burleigh over the course of a few years, including, most recently, in Spring 2014. This historically intermittent interest became immediate and urgent, however, on or about July 18, 2014, the very day Aileron Solutions, LLC ("Aileron") announced its acquisition by IMS Health.  Based on Truven's urgent interest in hiring Burleigh away from IMS Health upon learning of the Aileron acquisition, it appears that Truven made the decision to poach a competitor's employee with the knowledge necessary to gain an unfair advantage in its competition with the now IMS Health-owned Aileron.  There is no credible way that Burleigh can claim that he can faithfully serve Truven without disclosing this expertise and/or leveraging

his first-hand knowledge, which he developed while on IMS Health's payroll with the benefit

IMS Health's resources and investment of hundreds of thousands of dollars.

9.      On August 4, 2014, Burleigh informed IMS Health that he was

terminating his employment with IMS Health effective August 15, 2014.  He did not mention his

having accepted employment with Truven.  Instead, when asked where he would be working

next, he told his manager (Wallace) that he would prefer not to say and that he was not obligated

to provide that information.  Wallace cautioned Burleigh that he was likely subject to a

Restrictive Covenant Agreement and made several efforts to persuade Burleigh to remain with

IMS Health, giving Burleigh multiple opportunities to rescind the resignation, which he rejected.

It was not until IMS Health confronted Burleigh with his Restrictive Covenant Agreement, and

Burleigh then consulted with Truven, that Burleigh finally admitted that he was going to work

for Truven.

10.      Burleigh's initial reluctance to disclose his employment with Truven

appears to reflect his own concern that his new job conflicted with his Restrictive Covenant

obligations to IMS Health.  At his exit interview with IMS Health Human Resources, Burleigh

candidly admitted that he was concerned about accepting employment with a competitor and

whether he could do so in light of his obligations to IMS Health, a concern which IMS Health

shared.  Even after Burleigh had announced his resignation and identified Truven as his new

employer, IMS Health made efforts to retain Burleigh because of his key role and knowledge of

IMS Health trade secrets and confidential information.  Burleigh, however, rejected IMS

Health's overtures, preferring to disregard his contractual obligations even when made aware of

concerns and given the opportunity to stay at IMS Health.

11.     IMS Health then requested that Burleigh provide a job description for his new position, which he did on August 8, 2014.  While that job description identified a number of responsibilities that Burleigh would have with respect to leading Truven's MarketScan product team, a number of which products and services are directly competitive with IMS Health offerings, a subsequent job description provided by Truven lawyers a week later on August 15, 2015 was substantially different.  Notably, it named Burleigh as the Director of Product Development for its employer and health plan commercial businesses, but had no references to MarketScan products and services, replacing them instead with only generic and ambiguous references to Truven "products."  *See* Aug. 8, 2014 Email from Burleigh to Wurzer, a true and correct copy of which is attached hereto as Exhibit B; Aug. 15, 2014 Email (12:22 PM) from Labbienti to Spaniel, a true and correct copy of which is attached hereto as Exhibit C.

12.     Significantly, IMS Health contacted Truven immediately upon Burleigh's admission that he would be working for them in an effort clarify the nature and responsibilities of Burleigh's new role, protect its proprietary information, and avoid any dispute arising from Burleigh's Restrictive Covenant, but did not receive a substantive response until more than a week later on August 15, 2014, the Friday before Burleigh's start date.

13.     Upon information and belief, certain offerings within Truven's MarketScan product suite and/or the generic "products" with which Burleigh will be working pursuant to the discrepant job descriptions provided by Burleigh and Truven are directly competitive with the analytics and informatics products on which Burleigh worked at IMS Health within the IM division, as well as with IMS Health's recently acquired Aileron Precision Targeting Solution, IMS Health's strategy with respect to which was central to Burleigh's work for IMS Health.  Accordingly, upon information and belief, Burleigh's job duties for Truven

would necessarily, if not inevitably, compete with the functions he performed for IMS Health. Burleigh would necessarily, or inevitably, rely upon the trade secrets and confidential information IMS Health entrusted to him as an employee.

14.     In addition, IMS Health is deeply concerned that the provision of conflicting job descriptions by Burleigh and Truven in the space of a week, the latter having conceivably been scrubbed of overt references to competitive Truven products and services, evidences both Burleigh's intent to flout the terms of the Restrictive Covenant he signed and his unwillingness to cooperate with IMS Health to ensure that its trade secrets and confidential information are protected.  IMS Health's need for immediate and effective injunctive relief is particularly compelling in light of the job duties Burleigh performed for the Company.

15.     Adding significantly to IMS Health's need for immediate injunctive relief is the fact that clients of companies like IMS Health and Truven generally enter or renew their contracts for the competitive products and services at issue here on an annual basis between approximately November and February.  This annual renewal cycle follows IMS Health's, Truven's, and other companies' updating of those competing products and services with the raw data they gather from their respective, proprietary collection of sources, which data is generally updated on an annual basis during the August and September months, *i.e.*, right now.  Like its competitors, IMS Health then runs the updated data through its proprietary analytics modeling methodologies, including those developed by Burleigh and obtained in the Aileron acquisition, to support the sale and implementation of updated product solutions for customers between November and February.  In other words, Burleigh's departure to Truven with his expertise and unparalleled familiarity with IMS Health's products and services comes at a critical point in the industry's annual lifecycle and poses a particular threat that Truven will immediately profit from

Burleigh's knowledge at IMS Health's expense, effectively permitting Truven to reap the benefits of the considerable capital and myriad resources invested by IMS Health to support the development of its products and Burleigh's expertise with respect to them.

16.     Despite IMS Health's concerns and Burleigh's contractual obligations, it did not (and does not) seek to preclude Burleigh from employment with Truven in entirety, but only to protect the key areas in which his IMS Health-based knowledge could be used to IMS Health's detriment and Truven's advantage.  In the days following IMS Health's revelation that Burleigh had accepted a position with Truven competing with IMS Health in direct contravention of his Restrictive Covenant, IMS Health reached out to Truven to obtain narrowly-tailored assurances that would permit Burleigh's employment with Truven while protecting IMS Health's legitimate, protectable interests.  Specifically, IMS Health requested that Burleigh (1) review with Truven Human Resources or Legal representatives Truven's Code of Conduct with respect to the necessity of Burleigh maintaining the confidentiality of IMS Health's proprietary information, as well as the reasonable measures Truven and Burleigh would undertake to avoid disclosure of that information; (2) not directly or indirectly provide services or support to (i) Truven's Facility Targeting Forecast Reports or (ii) Truven's Market Scan databases to the extent such databases address procedures and diagnosis in the In-Patient or Out-Patient setting, including Market Scan Online Query Tools until May 15, 2015; (3) confirm that he has complied and will continue to comply with the non-disclosure and non-solicitation provisions of his Restrictive Covenant; and (4) provide periodic sworn declarations to IMS Health affirming his compliance with the foregoing assurances.  To date, neither Burleigh nor Truven has agreed to provide meaningful assurances, instead offering only vague and unsatisfactory assurances with respect to IMS Health's confidential information.

17.     Indeed, while Truven's initial responses to IMS Health's inquiries about Burleigh's new role suggested both that he would not be working on products or services competitive with IMS Health offerings and that Truven's own Code of Conduct and business practices would prohibit Burleigh's use of or reliance on his knowledge of IMS Health's proprietary information, Truven's counsel added that it did not believe Burleigh's Restrictive Covenant was valid or enforceable in any event.  This response did not, therefore, instill any confidence in IMS Health that its proprietary information would be protected.

18.     IMS Health's need for immediate and effective injunctive relief is a direct result of Burleigh's actions.  IMS Health thus brings this action to prevent Burleigh from causing irreparable harm to the Company by flouting contractual obligations he possessed by performing work for Truven and unfairly competing against IMS Health.

## JURISDICTION AND VENUE

19.     Jurisdiction is proper due to the express consent of Burleigh, pursuant to the terms of Section 8.4 of Burleigh's executed Restrictive Covenant (Ex. A).

20.     Venue is proper pursuant to the terms of Section 8.4 of Burleigh's executed Restrictive Covenant (Ex. A).

21.     The District Court has subject matter jurisdiction over all counts pursuant to 28 U.S.C. § 1332 because the amount in controversy in the present action exceeds the sum or value of seventy five thousand dollars ($75,000.00), exclusive of interests and costs, and there exists complete diversity of citizenship, as Plaintiff is a corporate citizen of Delaware and Connecticut and Burleigh is a citizen of Pennsylvania.

## THE PARTIES

22.     Plaintiff IMS Health Corporation is a Delaware corporation with its principal place of business at 83 Wooster Heights Road, Danbury, Connecticut  06810.

23.     Defendant Edward Burleigh is an individual and a citizen of the Commonwealth of Pennsylvania, residing at 546 Sterling Street, Newtown, PA 18940.

## FACTUAL ALLEGATIONS

**A.      IMS Health's Business And Burleigh's Expertise With Respect To The Trade Secrets and Confidential Information That Drive IMS Health's Success.**

24.     IMS Health is a leading global information, services, and technology company dedicated to improving healthcare.  IMS Health helps its customers improve patient outcomes and operate more efficiently by providing clients with real-world evidence, advanced analytics, and proprietary software platforms.  IMS Health's customers include, but are not limited to, hospital systems, pharmaceutical, medical device and consumer health manufacturers and distributors, healthcare providers, payers, government agencies, policymakers, researchers, and the financial community.  IMS Health partners with its customers to provide evidentiary-based data to help generate improved customer outcomes.  IMS Health markets its products throughout the United States and internationally.

25.     IMS Health provides comprehensive data and evidence-based analysis for customers in various healthcare industries.  Burleigh's most recent position at IMS Health involves an in-depth and key role in the development and recent enhancement of services that involve, among other things, working with hospital inpatient / outpatient claims data (state-reported and Center for Medicare & Medicaid Services ("CMS") reported), and working with hospital commercial payer and physician claims data, and Charge Detail Master hospital data); projection methodologies for procedures and diagnoses codes at healthcare facilities (particularly at hospitals, integrated health networks, and outpatient surgery centers); practitioner-level targeting and segmentation for the healthcare settings and data mentioned above; linkage of de-identified patients within retail prescription and physician medical claims to show physician

rendering and referral relationships; and key thought leadership/influence into IMS Health offerings related to the healthcare informatics solutions referenced above.

26.     Indeed, particularly with respect to practitioner-level targeting and segmentation for the aforementioned healthcare settings, Burleigh was the principal architect of the proprietary methodology and software coding on which IMS Health relies in providing related services to its clients.  Burleigh's status in this regard means that he has detailed knowledge of the sources of the comprehensive data relied upon and *not* relied upon by IMS Health to provide analysis for its customers, the quality of the data provided by suppliers, and, in some instances, the use restrictions negotiated by the supplier for the data, the platforms and processes created by IMS Health through great effort and resources to acquire and standardize incredibly diverse and complex data sets, and some of the analytic techniques used by IMS Health to provide valuable analysis to its customers.  With respect to practitioner targeting and segmentation, Burleigh's leadership role with respect to the analytics on which IMS Health now relies gives him intimate knowledge of the blueprint for how IMS Health competes with its competitors, including Truven.

27.     In these respects, Burleigh is aware of trade secrets and confidential information regarding a number of important facets of IMS Health's business on which it is competitive with Truven.  Indeed, Burleigh has worked on the kind of healthcare data analytics relevant here for nearly seven years in different roles for IMS Health and SDI, Burleigh's previous employer acquired by IMS Health in 2011.  He has most recently worked as an Engagement Manager for IMS Health with respect to hospital and other healthcare facilities analytics and informatics solutions, in which role he acquired intimate knowledge of the inner workings of IMS Health's most competitive products.

28.     First, Burleigh was the principal architect and drafter of software code that permits IMS Health to extrapolate from the data it collects critical information not only about the diagnostic and surgical practices of particular facilities, but also those practices of individual healthcare practitioners within those facilities.  Burleigh's contributions in this regard go beyond merely collecting and staging the data for analysis and extrapolation (which are also proprietary IMS Health practices about which he has familiarity and on which IMS Health competes with Truven), but enable IMS Health to tell its customers which healthcare facilities and which individual healthcare practitioners within them are important based on the volume of their activities both generally and in specific therapeutic areas.  This information is invaluable to IMS Health's pharmaceutical, medical device, biotech, and other clients, and IMS Health's ability to provide it helps it compete in the marketplace, including with Truven.

29.     Second, Burleigh's intimate knowledge of IMS Health's acquisition of Aileron looms large.  Prior to IMS Health's acquisition of Aileron, Aileron became a value-added reseller of certain Truven offerings.  Upon information and belief, Burleigh's hiring by Truven immediately following IMS Health's purchase of Aileron suggests Truven seeks an alternative to an IMS Health-owned entity for building/fortifying practitioner-level targeting solutions, relying upon Burleigh's knowledge to fill this gap virtually overnight.  Burleigh knows IMS Health's strategy for implementing and using Aileron going forward, and this real-time knowledge can be used to develop products at Truven that counter IMS Health's business strategy.

30.     Third, beyond Burleigh's intimate knowledge of IMS Health's existing and market-critical ability to provide both facility-based and granular, practitioner-level analytics within and across different facilities, Burleigh has also been uniquely privy to enhancements to

its methodology developed over the last 15 months.  These enhancements were recently launched, but Burleigh's knowledge of them and their strategic implications gives Truven a unique ability to combat IMS Health's planned advancements in the marketplace.  Indeed, IMS Health considered Burleigh to be the "quarterback" of its efforts to enhance its existing practitioner-specific methodology, and was one of approximately six IMS Health employees driving the process.  In fact, Burleigh's contribution is further demonstrated through his recent contribution to a key company innovation, being named as an inventor in a patent application to be filed by IMS Health.  There is no doubt that IMS Health and Truven are therefore competitors in this regard.

31.     Fourth, in addition to the significance of Burleigh's role in designing IMS Health's methodology for producing practitioner-specific data within and across healthcare facilities, he also has extensive knowledge of the clients that retain IMS Health, for what services, and where IMS Health has experienced challenges in meeting those clients' needs. Specifically, Burleigh has the ability to identify any number of major clients in particular IMS Health service areas and the complementary ability to identify those service areas for which they do not use IMS Health.  Such information, on which Burleigh would necessarily have to rely based on his years of experience, would enable Truven to better target those IMS Health clients.

32.     Fifth, beyond Burleigh's knowledge of the sources of IMS Health's data and the methodologies it uses to produce both facility- and practitioner-specific analytics, he has long served as a subject-matter expert on the design, implementation, operation, and troubleshooting of IMS Health's client solutions.   These methods are specifically tailored to IMS Health's resources and business solutions, and Burleigh's years refining his skills with respect to the operation of IMS Health-specific client solutions presents a potential windfall to

Truven if Burleigh's Restrictive Covenant is not enforced.  Certainly, IMS Health and Truven

are competitors with respect to client service in this area.

    33. Sixth, Burleigh has intimate knowledge of the actual data, and the sources

thereof, that are acquired for the Company's database warehouses for use in designing analytics

solutions for clients.  IMS Health collects data from a broad range of data suppliers, ranging

from software suppliers and publicly available data sets to individual healthcare facilities and

medical claims clearing houses (claims adjusters).  While some of these suppliers are publicly

known and not confidential, many suppliers that provide the data that fuels IMS Health's

business are not public or readily identifiable.  Instead, these data suppliers have been identified

through investment by IMS Health, an effort which includes the equally valuable identification

of those suppliers whose data is of lesser or no value to IMS Health and its clients.  In addition,

in this business, it is not just essential to be able to identify data suppliers, but to have knowledge

as to the format in which their data is stored and use restrictions they may have as a condition of

sharing data.   Because they apply and analyze the data to improve outcomes, IMS Health and its

customers need the highest quality data to provide meaningful analysis.  The source of the data is

extremely valuable because it informs the quality of the analysis that follows.  One of the ways

in which IMS Health and Truven compete is on the basis of the sources and quality of their data.

Whether expressly disclosed or silently leveraged in his new position at Truven, Burleigh's

combined knowledge of IMS Health's data sources *and* how they are used would give Truven a

direct and unfair advantage.

    34. Finally, Burleigh had access to all pricing information for the product

solutions he developed and serviced.  IMS Health's pricing structure for the products on which

Burleigh worked is uncomplicated and easily retained through memory.  He will inevitably use this information to disadvantage IMS Health in bidding for contracts.

**B.      IMS Health Protects its Trade Secrets and Confidential Information to Drive Its Success.**

35.      IMS Health recognizes the tremendous value of its trade secrets and confidential information and takes steps to protect access to such information.  IMS Health has in place policies, including a business conduct policy, that require employees to keep its business information confidential and prohibit employees from using its information for any purpose other than the benefit of IMS Health.  These policies are available on the Company intranet to which all IMS Health employees have access.

36.      IMS Health also requires employees to acknowledge their confidentiality obligations and requires certain key employees, such as Burleigh, to enter into restrictive covenants preventing them from competing with the Company for a limited time so that IMS Health's competition does not receive the benefit of its trade secrets and confidential information.

37.      IMS Health also physically restricts access to their facilities both for third-parties and for their employees.  IMS Health facilities are not generally open to the public.  Access to IMS Health facilities is controlled through a card-swipe system and/or through a receptionist.  Third-parties are only allowed access to the section of the IMS Health facility related to their legitimate business.  IMS Health employees also do not have unfettered access to all IMS Health facilities but are generally restricted to the facility in which they work, unless there is a legitimate business reason for broader access.

38.      IMS Health restricts access to its on-line systems and information technology on an as-needed and password protected basis.  IMS Health controls and limits which

employees have permission to access its databases to employees who have a legitimate business

purpose for such access.  For example, absent a specific reason and then only for a limited time,

an employee in accounts payable would not have access to the sections of IMS Health's servers

that house the databases it analyzes for its customers.  IMS Health further protects its electronic

business information through the use of encryption services and firewall protections.

39.     In sum, IMS Health recognizes the importance of its trade secrets and

confidential information and takes appropriate steps to protect them.

**C.     Burleigh's Restrictive Covenant.**

40.     As noted, in consideration for Burleigh's employment and participation in

SDI's bonus plan, among other benefits, Burleigh entered into the Restrictive Covenant with SDI

(now IMS Health).  The Restrictive Covenant expressly prohibits Burleigh from competing

against the Company for a one-year period following his separation from IMS Health.

Specifically, it provides that

> Employee Agrees that during his/her employment by the Company and for a
> period of one year after that employment, terminates…Employee shall
> not…establish, own, manage, operate, finance or control, or participate in the
> establishment, ownership, management, operation, financing or control of, or
> permit his/her name to be used in connection with or be otherwise connected in
> any manner with any person business or proposed business engaged, or planning
> to be engaged, in the Company's Business if (i) such person, business or proposed
> business competes directly or indirectly with the Company's Business, or (ii) such
> person, business or proposed business competes with the Company's Business
> with regard to any customers of the Company or its affiliates that Employee
> called on, serviced, solicited, attempted to solicit, had contact with or became
> aware of during [his or her employment]…For purposes of this Agreement, the
> "Business" of the Company shall mean the provision of analytical and report
> services to pharmaceutical marketing and sales organizations through the use and
> integration of medical, diagnostic and pharmacy claims data and such other
> related products and services as the Company, any subsidiary or any then-current
> affiliate may provide or propose to provide during the term of Employee's
> employment.

Restrictive Covenant at § 3.

41.     In addition, in his Restrictive Covenant, Burleigh expressly acknowledged that IMS Health would provide him access to trade secrets and confidential information by virtue of the position he occupied, and that he was prohibited from disclosing or relying upon this information for any purpose other than the benefit of IMS Health.  *Id.* at §§ 1.1, 1.2.  The covered "Proprietary Information" prohibited from disclosure includes, among other things, "trade secrets, inventions, mask works, ideas, processes, apparatus, equipment, formulae, algorithms, software programs, source and object codes, data, programs, listings, patents, copyrights…other works of authorship, know-how, improvements…and techniques relating to the current, future and proposed product and services of the Company."  *Id.* at § 1.2.

42.     These reasonable and limited restrictions provided assurances to IMS Health that its trade secrets and confidential information will only be used for legitimate purposes.  The Restrictive Covenant was likewise intended to ensure that Burleigh and any subsequent employer, such as Truven, would not be able to benefit at the expense of IMS Health by gaining access to Burleigh's knowledge of IMS Health's products and market strategies in the same commercial space.

43.     Burleigh further acknowledged in the Restrictive Covenant that IMS Health's business is "highly competitive and requires substantial and continuous expenditures of time and money to develop, market and maintain," in consideration of which its restrictions were "narrow and reasonable" in light of the Company's "present strategy and its future needs to market its services and sell its products in a large geographic area in order to have a sufficient customer base to make the Company's business profitable…"

44.     The Restrictive Covenant is reasonable in its temporal and geographic scope.

**D.    Burleigh's New Employer, Truven, is a Direct Competitor of IMS Health In the Areas Where Burleigh Has Knowledge of IMS Health's Trade Secrets and Confidential Information.**

45.    Truven is a direct competitor of IMS Health, as evidenced through multiple products and offerings that overlap between the companies.  Indeed, as noted above, Burleigh himself expressed concern about accepting employment with Truven due to their status as a direct competitor of IMS Health during his exit interview with Laura Wurzer, IMS Health's Director of Human Resources.  As a general matter, Truven provides similar services to IMS Health's with respect to the collection, integration and staging of data from multiple healthcare provider sources, which data Truven then analyzes across given healthcare facilities, such as hospitals, inpatient and outpatient clinics, etc.  The data sources, staging methods, analytics methodologies and code employed by IMS Health to produce practitioner-based targeting data were in large part developed and operated by Burleigh as chief architect.  Additionally, he was instrumental and a key subject matter lead on the recently enhanced methodology for facility and physician based hospital targeting analytics. Thus, he has intimate familiarity with those aspects of IMS Health's facility-based data analytics that IMS Health uses to compete.  To the extent both Truven and IMS Health provide these services, they are direct competitors.

46.    Indeed, IMS Health has reason to believe that, at the very least, Truven's Facility Targeting Forecast Reports and Truven's Market Scan databases are competitive with IMS Health products and services, about which Burleigh has expertise, to the extent such databases address procedures and diagnosis in the inpatient or outpatient setting, including its Market Scan Online Query Tools.  Accordingly, IMS Health asked for assurances that Burleigh would not work on these products during the covenant period – to no avail.

47.     Specifically, Truven made its offer of employment to Burleigh in less than a month of IMS Health's acquisition of Aileron, undoubtedly evidencing Truven's desire to remain involved in providing practitioner-specific data solutions and to reduce its reliance on Aileron as a reseller.  Burleigh's hire and his unique expertise in literally writing the code on which IMS Health relies to prepare its own practitioner-specific data will permit Truven to skip or reduce the time and monetary investment that would otherwise be needed to develop its own practitioner-specific analytics products because it can rely upon Burleigh's knowledge gained at IMS Health.  This will allow Truven, through Burleigh, to gain sales at IMS Health's expense because it will not have to make the significant investment of additional resources and time to learn what works and what does not work.  Additionally, Burleigh's knowledge could be used to inform Truven's positioning in the marketplace.

48.     Significantly, Burleigh's hire by Truven comes at a critical time in the industry lifecycle.  Companies like IMS Health and Truven earn the vast majority of their revenues in the areas in which Burleigh has expertise in connection with these products between November and February, generally the period during which the data supporting facility- and practitioner-level analytics products is renewed and clients enter their annual contracts for IMS Health's and Truven's services.  With Burleigh hiring and the knowledge of IMS Health's proprietary methods for producing practitioner-level analytics that he will necessarily bring to bear at Truven, Truven will be able to disadvantage IMS Health at this critical time and make sales at IMS Health's expense that Truven would not otherwise have made.

**E.     Burleigh Leaves His Employment and Provides Limited Affirmation His Commitment to Abide By His Agreement.**

49.     On July 15, 2014, Burleigh approached his supervisors, Keith Mandia and Charles Wallace, and informed them that he had engaged in discussion seeking a new position

outside of IMS Health.  During that conversation, Mandia and Wallace reminded Burleigh that

his Restrictive Covenant may be implicated if his new employer or role was deemed to be

competitive with his current post at IMS Health.  On July 29, 2014, Burleigh requested a copy of

his IMS Health personnel file from his manager and IMS Health Human Resources.  Later that

week, he reviewed his file with IMS Health Human Resources and admitted that he was looking

for a copy of his Restrictive Covenant, which, at that point, had not been retrieved from IMS

Health archives.  On the morning of August 4, 2014, Burleigh promptly advised IMS Health that

he would be terminating his employment with the company effective as of August 15, 2014.  He

did not mention his having accepted employment with Truven and instead, when asked where he

would be working next, he told his manager (Wallace) that he would prefer not to say and that

was not obligated to do so.  Later on August 4, IMS Health Human Resources completed their

retrieval of his restrictive covenant and provided it to Burleigh.  At that point, Mandia and

Wallace advised Burleigh and IMS Health Human Resources that they believed Burleigh's new

employment might violate the Restrictive Covenant he had signed.  During his August 7, 2014

exit interview with Laura Wurzer, IMS Health's Director of Human Resources, Burleigh

acknowledged *his own* concern with accepting employment with Truven due to their status as a

direct competitor of IMS Health, but represented that Truven's legal and human resources

personnel had assured him he would be screened out of any discussions regarding IMS Health.

Burleigh also told Wurzer that the day IMS Health acquired Aileron, Truven called Burleigh

with a job offer for Director of Product Development.  During the conversation, Wurzer

reiterated IMS Health's concerns that Burleigh's employment with Truven would violate his

Restrictive Covenant and made significant concessions to incentivize Burleigh to stay, including

offering him the ability to work from home five days a week to accommodate his childcare

needs, which Burleigh had cited as the primary factor for his move to Truven.  Burleigh declined

Wurzer's offer and confirmed his intent to accept employment with Truven.

      50.     During this meeting, Wurzer also requested that Burleigh provide a job

description for his new position at Truven.  Burleigh provided a job description the following

day on August 8, 2014, which appeared to have been provided to him by Jamie MacDonald, a

Truven Human Resources Generalist.  The description, which did not contain a job title,

generally provided that Burleigh would be responsible for "developing the strategic plan for the

MarketScan family of databases with input from across the company," "for the annual operating

plan for the databases," and "[l]ead development of pricing strategies."  *See* Aug. 8, 2014 Email

from Burleigh to Wurzer, a true and correct copy of which is attached hereto as Exhibit B.  The

description also provided that Burleigh would be responsible for ensuring that MarketScan

databases and their data were built and used in compliance with HIPAA; for developing sales

and pricing schemes; and for "improv[ing] MarketScan research databases by improving existing

data, expanding populations and variables, [and] linkage to clinical data" while leading the

"MarketScan innovation and investment process."  *Id.*

      51.     Significantly, IMS Health contacted Truven immediately upon Burleigh's

admission that he would be working for them in an effort clarify the nature and responsibilities

of Burleigh's new role and whether it would violate the terms of his Restrictive Covenant.  In an

effort to work with Truven to identify mutually agreeable parameters to avoid a potential dispute

stemming from Burleigh's Restrictive Covenant and the potential disclosure by Burleigh of IMS

Health's confidential information, IMS Health offered to continue to employ Burleigh through

the time of his anticipated start date to prevent any loss to either Burleigh or Truven.  Truven's

counsel did not provide any substantive response until more than a week later on August 15,

2014, the Friday preceding Burleigh's start date.  Burleigh did not start his new employment

with Truven in earnest for another week due to his new supervisor's vacation, which afforded

IMS Health additional time in which to attempt to resolve any potential dispute.

        52.     In its August 15, 2014 response to IMS Health, Truven's in-house legal

counsel forwarded an entirely different job description for Burleigh, which provided that he

would be the "Director, Product Management" for the employer and health plan side of the

commercial business, for which he would be responsible for "developing the strategic plan" for

Truven's customer solutions, including managing Truven employees responsible for "the

definition and development of innovative enhancements" for customer solutions during the

implementation and use of Truven products.  *See* Aug. 15, 2014 Email from Truven Counsel to

Spaniel at Ex. C.  This new job description removed any references to the MarketScan product

suite and contained only generic references to the Truven "products" with which Burleigh would

engage in his new role.

        53.     In addition, though Truven also advised in another August 15, 2014

response that its own policies and practices would prohibit Burleigh's use of or reliance on IMS

Health's confidential information in his new role at Truven, Truven also stated that it believed

Burleigh's Restrictive Covenant was overbroad, unenforceable, and likely to be struck down by a

court should IMS Health attempt to enforce it.  See August 15, 2014 Email (9:56 AM) from

Truven Counsel to Spaniel, a true and correct copy of which is attached hereto as Exhibit D.

While this dismissive response provided IMS Health with little comfort that Truven or Burleigh

would take the proper steps to protect IMS Health's trade secrets, it also failed to account for the

reality that Burleigh could not simply compartmentalize and store away his knowledge of IMS

Health's trade secrets when working in his new role.  Indeed, given Burleigh's lengthy

experience with and immersion in IMS Health's facility- and practitioner-specific data methodologies and solutions, he would inexorably leverage his knowledge and experiences when working in any capacity for his new employer.

54.     The lack any real assurances from Truven notwithstanding, upon information and belief, the discrepant job descriptions provided by Burleigh and Truven, respectively, evidence an attempt to disguise the directly competitive work Burleigh will be doing at Truven in violation of his Restrictive Covenant long enough to permit Truven to disadvantage IMS Health this fall and winter in selling practitioner-level analytics services. This, coupled with Truven's refusal to provide or engage in good faith on the subject of the extremely limited assurances IMS Health seeks that Burleigh will not work on any competing Truven products or services until next spring, 2015 (after the upcoming contracting cycle ends) raises serious concerns about the intent behind his hire and Burleigh's (and his new employer's) commitment to honor his contractual obligations.

55.     At best, by email dated September 3, 2014 from Burleigh to IMS Health, Burleigh represented that he was "mindful" of his Restrictive Covenant and had no intention of violating it.  He stated, however, that he did not "intend to disclose any IMS Health or Aileron specific intellectual property or confidential information to Truven Health outside my job responsibilities."  *See* Sept. 3, 2014 Email from Burleigh to Mandia, a true and correct copy of which is attached hereto as Exhibit E.  Despite his representation in this regard, given the anticipated overlap between Burleigh's job responsibilities at IMS Health and his new duties at Truven, IMS Health believes that Burleigh's use of and reliance on IMS Health's confidential information is inevitable, if unintentional.

56.     Under the circumstances, in light of his title and refusal to provide even the most basic assurances and information, IMS Health reasonably believes that Burleigh's employment with Truven is in violation of his contractual obligations to the Company.

**F.     Burleigh's Employment With Truven Is A Direct Threat To IMS Health.**

57.     Given the intimate knowledge that Burleigh has about IMS Health's processes for (1) procuring various kinds of inpatient and outpatient claims data; (2) projection methodologies for procedure and diagnostic codes at healthcare facilities; and (3) facility- and practitioner-level targeting and segmentation methodologies for the healthcare settings and related data, it is apparent that his responsibilities at Truven as Director of Product Development will require him to draw on and leverage information that he learned as a trusted fiduciary of IMS Health.

58.     Burleigh knows what works and, just as importantly, what does not work (so-called "negative know how") in the marketing and development of facility and physician level analytics solutions and the sources of data underlying them.  Burleigh will necessarily have to rely upon that knowledge, acquired through his employment at IMS Health, in the performance of his duties for Truven.  Burleigh will not be able to simply "shut off" his knowledge in these areas gained from working at IMS Health.  Nor will Burleigh suggest strategies for Truven that he already considered while working for – and on the payroll of – IMS Health and which through trial or experience he knows did not work.  Indeed, Truven likely hired him because of the expertise he acquired through his employment at IMS Health and, presumably, is generously compensating him to lead their Product Development team.  It is inconceivable, given his responsibilities for Truven, that Burleigh could just choose to forget or not rely upon knowledge he gained at IMS Health when performing comparable duties for Truven.

59.     Burleigh cannot simply forget his knowledge of IMS Health's data sources, including the various governmental, hospital, and private sources that IMS Health has spent voluminous resources to cultivate.  Data compilation supporting facility and practitioner targeting and segmentation methodologies is an area where Truven and IMS Health directly compete, and where Truven would expect Burleigh to add value by using his prior experiences at and knowledge from IMS Health to strengthen Truven's offerings.  Burleigh cannot shut off the part of his memory that houses this information, nor can he serve Truven to the best of his ability without using that knowledge in the performance of his job duties.

60.     With specific regard to methodologies for extrapolating practitioner-specific data from data within and across given healthcare facilities, Burleigh *literally* wrote the code that IMS Health uses to compete in this field.  Relatedly, he has played a significant role in the last 15 months in developing enhancements to IMS Health's methodologies in this regard, which enhancements are proprietary and highly confidential and will help IMS Health compete. IMS Health is concerned that if Burleigh works in any capacity on Truven solutions competitive with IMS Health offerings, particularly those on which he worked in his most recent position at IMS Health, he will unintentionally or intentionally rely on his knowledge of both IMS Health's existing and enhanced methodologies for IMS Health's practitioner-specific segmentation analytics products, use of which information will vitiate the substantial temporal and monetary investment IMS Health has made in these products and Burleigh's expertise with respect to them over the last several years.  It is inconceivable that Burleigh could serve in a product development or other strategic capacity at Truven without drawing from his knowledge of IMS Health.

61.     This logic applies with equal force to IMS Health's implementation and strategic plans for Aileron, which is a value-added reseller for Truven.  Truven will undoubtedly rely on Burleigh's knowledge of practitioner-level segmentation methodologies proprietary to IMS Health to replace the services previously provided by Aileron.  Moreover, Burleigh must necessarily reveal confidences concerning IMS Health's plans for Aileron's implementation if he is to provide his best efforts in serving Truven as his new employer, all of which is in violation of Burleigh's Restrictive Covenant and will eviscerate how IMS Health competes against Truven in this commercial space.

62.     Truven would receive a tremendously unfair advantage by employing Burleigh during the period of his IMS Health non-competition obligation.  Truven would learn details of IMS Health's facility- and practitioner-specific targeting and segmentation methodologies, the latter of which Burleigh authored, without investing the hundreds of thousands of dollars, time commitment, or physical materials that IMS Health invested in creating those processes.

63.     IMS Health will be irreparably harmed if Defendant is permitted to violate the Restrictive Covenant in these ways.  IMS Health's trade secrets and confidential information in the as described herein would be disclosed and/or used, likely inevitably (consciously or otherwise), by Truven.  The very purpose of the Restrictive Covenants was to ensure that Burleigh would not present such a risk of harm to IMS Health.  And, without restricting his employment, IMS Health has no way of policing Burleigh's compliance with his obligations – even if such compliance were possible.

64.     IMS Health must be afforded the benefit of the non-competition period so that Burleigh's memory can fade, information can grow stale over time, and IMS Health can take

the requisite measures to protect itself, to identify replacements who can fill the void left by the departure of Burleigh and his unique skillset, and to provide those replacements with at least some of the training and opportunities that IMS Health provided to Burleigh for significant compensation.  Otherwise, Truven would be able to unfairly compete by capitalizing on IMS Health's investment in its data sources, analytics methodologies, and Burleigh's knowledge of IMS Health's confidential information and trade secrets (which are not known to the general industry), without ever having made the type of investment that IMS Health has made to obtain success in the commercial market.

65.     Further, Burleigh and Truven's apparent efforts to circumvent Burleigh's obligations to IMS Health by refusing to agree to narrowed and unquestionably reasonable assurances requested by IMS Health demonstrates that he is likely to compete with IMS Health and disregard his contractual and common law obligations to IMS Health.  Indeed, if Burleigh were confident that his performance of job responsibilities for Truven was not a potential problem, there is no conceivable reason that he could not have been forthright in accepting the proposed assurances.

66.     Although IMS Health cannot calculate the value of the harm caused by Burleigh's contravention of his Restrictive Covenant through his employment by a competitor, it is clearly in excess of $75,000.00 given the value of IMS Health's confidential data sources and analytics methodologies, all of which Burleigh can now use for a competitor's benefit.

## COUNT I

### BREACH OF BURLEIGH'S RESTRICTIVE COVENANT

67.     Paragraphs 1 through 66 are incorporated by reference as if set forth fully therein.

68.     Burleigh continues to be bound by his Restrictive Covenant, which is an enforceable contract between him and IMS Health.

69.     Burleigh's Restrictive Covenant prohibits him from working for a competitor of IMS Health.

70.     Truven is a direct competitor of IMS Health that competes against IMS Health in the exact spaces where Burleigh has knowledge of IMS Health's trade secrets and confidential information.

71.     Upon information and belief, Burleigh has accepted employment with Truven and his job duties for Truven are similar to the job duties he performed while employed by IMS Health.

72.      Burleigh's breach of his Restrictive Covenant threatens immediate and irreparable harm to IMS Health.

73.     IMS Health has no adequate remedy at law, and will continue to suffer substantial and immediate irreparable harm unless Burleigh is enjoined as requested below.

74.     Greater injury will be inflicted on IMS Health by the denial of the relief requested herein than will be inflicted on Burleigh by the granting of this relief.[1]

## COUNT II

## <u>MISAPPROPRIATION OF TRADE SECRETS – 12 Pa. C.S.A. § 5301 *et seq.*</u>

75.     Paragraphs 1 through 74 are incorporated by reference as if fully set forth herein.

76.     Upon information and belief, Burleigh will, inevitably or intentionally, disclose to Truven, or use on behalf of Truven and for Truven's exclusive benefit, confidential

---

[1]     Notably, IMS offered to keep Burleigh on its payroll until this matter could be resolved.

information and trade secrets of IMS Health without the express or implied consent of IMS Health.

77.     By virtue of Burleigh's misappropriation of IMS Health's trade secrets for the benefit of Truven, IMS Health is threatened with immediate and irreparable harm.

78.     Burleigh's conduct has been willful and undertaken with reckless indifference to the rights of IMS Health.

79.     Greater injury will be inflicted upon IMS Health by the denial of the relief requested herein than will be inflicted on Burleigh by the granting of such relief.

## PRAYER FOR RELIEF

WHEREFORE, IMS Health requests the following relief:

(a)     Burleigh be enjoined, preliminarily until hearing, and thereafter indefinitely, from accepting employment or otherwise performing services for Truven or any other competitor of IMS Health that compete with the job duties he performed for IMS Health.

(b)     Burleigh be enjoined, preliminarily until hearing, and thereafter indefinitely, from using or presenting any of IMS Health's trade secrets or proprietary and confidential information to Truven or to any other party other than IMS Health.

(c)     Burleigh be directed to immediately return to IMS Health all Company documents and information, with the exception of documents and information pertaining to Burleigh's personal compensation.

(d)     Burleigh be ordered to promptly produce copies of all such Company documents during the expedited discovery process related to Plaintiff's Motion for Preliminary Injunction and Other Relief.

(e)     Burleigh be directed to pay actual damages, compensatory damages, punitive

damages, pre-judgment interest, and post-judgment interest.

(f)     Burleigh be directed to pay the costs of these proceedings.

(g)     This Court order such other and further relief, including attorneys' fees and costs

as it deems appropriate.


Dated: September 12, 2014                  Respectfully submitted,

                                          /s/ Jonathan S. Krause
                                          Michael L. Banks
                                          Jonathan S. Krause
                                          Brian W. Sullivan
                                          MORGAN, LEWIS & BOCKIUS LLP
                                          1701 Market Street
                                          Philadelphia, PA 19103
                                          215-963-5387/5077/5510
                                          mbanks@morganlewis.com
                                          jkrause@morganlewis.com
                                          brian.sullivan@morganlewis.com
                                          Attorneys for Plaintiff
                                          IMS Health Incorporated


DB1/ 80685558.2